And we will hear argument next in Silver Dollar Grazing Association v. the Fish and Wildlife Service. Thank you, Your Honor. May it please the Court, for the record, my name is John Bloomquist. I'm an attorney from Helena, Montana, here on behalf of Appellant Silver Dollar Grazing Association. This action involves challenge by the Association to the Fish and Wildlife Service decision to invoke a prescriptive grazing management plan on the silver dollar allotment within CMR Russell National Wildlife Refuge in northeastern Montana. The District Court granted summary judgment for the federal defendants on the three claims made by Silver Dollar in the case. On count two of the first amended complaint, the Association alleged that the Fish and Wildlife Service had violated the directives of Executive Order 7509, which established the refuge in 1936 at the Fort Peck Game Range, and the directives under Executive Order 7509 in this Court's decision in the Swinkie case. In effect, the District Court held that 7509 vests broad discretion with Fish and Wildlife Service and concluded that decisions on managing the land to protect wildlife were committed to the agency's judgment absolutely. In effect, Fish and Wildlife Service has ultimate discretion in managing the land. We believe the District Court's, as we set forth in the briefing, the District Court's review of 7509 is at odds with the language of the Executive Order. What is it, Counsel, that you wanted the Fish Service to do, to take an account of the antelope and the grouse? In terms of 7509, Your Honor, this Court was clear that wildlife has a limited priority. But it had a first priority. It has first priority. And 7509 establishes an allocation of forage resources. And 7509, as the Swinkie Court identified, stated that there are certain numbers, the primary species and associated secondary species, that would have that priority. So, yes, Your Honor, what we believe Fish and Wildlife Service needs to do in terms of compliance with 7509 is to allocate forage between wildlife and livestock. Because livestock was not eliminated. Under 7509, they're allowed to allocate grazing according to the regulations adopted by the Secretary. So that's kind of difficult to violate that provision here. But I thought that your complaint was that they hadn't done the actual count. That's part of it. On the grouse and the antelope. That's part of it. Because to allocate the forage, you need to have some numbers and some target numbers. And one of the things that the government has responded is that the directive for maintaining a balanced wildlife population has no real meaningful standard or meaningful review. And therefore, it's been delegated to the Secretary's discretion on what that might be. However, in allocating forage resources, go back to the Silver Dollar Habitat Management Plan of 1987, and the service did specifically what we think they should do in this decision, was to identify particular numbers of the species that the allotment would support. In other words, in the Silver Dollar Habitat Management Plan, they identified numbers of sharp-tailed grouse, numbers of antelope, mule deer, sage grouse that the range would support, beyond which livestock would have access on coequal status with the wildlife. Here in the challenge decision, the record is devoid of that type of assessment or that type of analysis. They simply allocated everything to the wildlife. And we believe that's in violation not only of the specific language of 7509, but again, this Court's direction from Schwenke on the ---- But, Counselor, the trouble I have with that argument is that there's nothing in 7509 that specifically requires the numerical count to control. There's a fair amount of discretion in the design of that executive order. I would disagree a bit, Your Honor, in looking at how the Schwenke Court handled that particular ---- or excuse me, the priority which was established by E.O. 7509. And in the holding of Schwenke, priority and access to forage resources on the range for numbers of the primary species and then that number of secondary species necessary to maintain a balanced wildlife population. The Schwenke Court looked at E.O. 7509 and did establish that numbers need to be established for primary species, secondary species. Beyond those limits, wildlife and livestock would have equal access to the forage resources. So I believe this Court, in looking at the executive order, plugged into the directive number of requirements. And the Fish and Wildlife Service in the past had done those, not only with numbers of wildlife, but also an allocation of forage. To go back to the 1985 EIS, they allocated forage. To go to the Habitat Management Plan in 1987 for the silver dollar, they allocated forage. In the challenge decision, that did not occur. In the end, the district court, I believe, was wrong in looking at E.O. 7509 as vesting unlimited discretion with the service. Well, what is it in the prescriptive grazing plan that you say gives priority to one side or the other, presumably from your point of view, gives priority to wildlife? In the effect of the decision and the decision itself, Your Honor, which is livestock will be removed, forage will be allocated 100% to wildlife, livestock may come back on in the Forest Service discretion if they believe it's necessary for wildlife habitat. That is not consistent with the direction under the 7509 or Schwingke. In other words, here there's an allocation clearly of 100% wildlife to some undetermined time in the future when livestock may or may not be allowed back on the grid. Counsel, have your clients got an argument here if we conducted a population study and found that we had more than 1,500 antelope and 400,000 grouse? I'm sorry, Your Honor? If we found that we had less than 1,500 antelope and what is it, 400,000 grouse? That's correct. If we had less than 400,000 grouse and less than 1,500 antelope, so we're under the caps established by the executive order, then your clients don't really have an argument, do they? Well, those, of course, are maximums. Those are the maximums. But as long as we haven't exceeded those, then the Forest Service has got – this is an unusual executive order. I don't think I've ever seen an order that put a maximum on the number of animals, of wild animals, that could occupy a particular area. It seems to me that your argument is they haven't done the population count, so they don't know that they don't have more than that. They haven't violated the EO. And if they violated the EO, then we're entitled to access to the grazing area. Well, in particular, let's go back. We don't know because they haven't done this. So it's a bit of a hypothetical. It's an empty box. What we do know is if we go back to the allotment level, which is the silver dollar allotment, they have in the past set numbers for the primary species. They have in the past set numbers for the secondary species and allocated forage between livestock and wildlife in the management, which we believe was consistent with Schwenke and the executive order. Here it simply doesn't exist. They never did the wildlife monitoring. They haven't done the wildlife monitoring. They haven't done the counts they said they would do. And so we're left with an empty box of a certain extent, Your Honor. Counsel, you may intend to get there, but I've got a question on the NEPA claim. Go right ahead, Your Honor. All right. The question I have is why isn't the court correct that you lack standing? In other words, it would appear to me, at least tentatively, that your interest is exclusively economic and not environmental. Of course, to establish standing, you have to articulate environmental interest, and I'm searching for it. What do you rely on? The record, Your Honor, and in particular the comments submitted by the association to the draft EA on the proposed decision, which outlines specifically numerous concerns with the proposed decision and its effects and impacts on range, range ecology, weed infestations, the transition of the range into what's known as a monoculture where one species of grass takes over all the others. There were specific technical comments submitted to the Fish and Wildlife Service on prescriptive grazing and what its impact would be on the range. And these are clearly environmental interests. Now, of course, the government and the district court looked at Silver Dollar Grazing Association and said, well, you're only interested in having access to the range for grazing livestock. Therefore, your interests are purely economic. You can't stop there. The proper term is injury. What is your environmental injury? Well, and that's a good point because I think, Your Honor, both the district court and the government have misstated the requirements for prudential standing on that subject. And in particular, I'd like to point the court out to, I believe it's the Center for Better Forestry case, where, in effect, what the court said was you have to raise environmental interest and environmental concern. You don't have to prove absolute environmental injury to have prudential standing because, in effect, what the requirement would be would be to undertake the analysis that the agency is supposed to do in the first place on environmental effects. It's not a standard that a NEPA plaintiff has to show absolute environmental injury to have prudential standing, but the plaintiff has to show as an environmental interest and environmental concern. And, again, in this case, it is pretty clear to us and pretty clear from the record that Silver Dollar, its members have interest beyond grazing, both in the wildlife and the hunting and the recreation on the allotment. They have specifically pointed out to the service concerns with prescriptive grazing and the ramifications of that grazing on the range resources and the range ecology. And I believe once a plaintiff establishes an environmental interest and environmental concern, that is sufficient under NEPA for prudential standing. And as the courts have indicated, at that point in time, even though you may have economic interest as well, the court doesn't need to dictate or establish, well, is it more economic or more environmental. In fact, you've established standing to raise those issues. Well, what do you rely on to meet the requirement that there has to be an injury in fact, an environmental injury in fact? As far as environmental injury in fact goes, it does go to if livestock grazing is removed, what is going to happen to this resource, the range resource? And what are the ramifications of that? The injury of that to Silver Dollar and its members is just in that, what the range resource supports, wildlife, aesthetics, the recreation, other aspects that are not necessarily directly related to cattle grazing. And we believe the record establishes that. I have about a minute and a half left, counsel. I'm going to save my time. All right. Very good. Okay. We'll hear from the Fish and Wildlife Service. May it please the Court, Alan Brabender representing the United States Fish and Wildlife Service. With respect to the NEPA claim, I think this case comes down to really a failure of proof. This case was resolved at the summary judgment stage. And at the summary judgment stage, the plaintiff had the burden to bring forth some admissible evidence establishing a genuine dispute of material fact as to whether or not they would suffer some sort of cognizable environmental injury. And as the district court determined, they utterly failed to meet their burden in this respect. They introduced no admissible evidence whatsoever sufficient to satisfy their burden. The district court was then left with no choice but to dismiss their NEPA claim for lack of prudential standing. What do we do with the fact that we've got members who enjoy hunting and recreation on this area that seems to be part of Silver Dollar's mission to help preserve that as well? Well, again, at the summary judgment stage, they had to introduce evidence explaining what their environmental injury would be. They may have an environmental interest such as hunting, for instance. I think they do state in their affidavits that they hunt on this land.  which they do not do in either their affidavits, which are deficient on their face, or in their comments submitted during administrative proceedings. But it's important to note that comments submitted during administrative proceedings are not admissible and cannot be used to withstand a motion for summary judgment. There are several problems with those comments. They're hearsay, for one. They're not made under oath, for two, as required by Federal Rule 56E of the civil rules. And they don't, in their improper lay opinion, they don't establish competency of the declarant to make the statements in those comments. What they needed to do was put forth affidavits under Rule 56E that complied with Rule 56E that detailed the environmental injury that they would suffer. And they didn't do that. They relied on statements of mere personal belief that they would suffer some sort of cognizable environmental injury. But as this Court has said in numerous cases, including the Connors case, the Columbia Pictures case, and the Taylor v. List case, that mere statements of belief in these affidavits are not sufficient to withstand a motion for summary judgment. And so, again, in the end, the district court was faced with no admissible evidence whatsoever establishing a genuine dispute as to whether or not they would suffer a cognizable environmental injury. And it faced no choice, really, but to dismiss their NEPA claim for lack of prudential standing. And just as I think the failure of proof characterizes the prudential standing issues, I think the deferential APA standard of review characterizes the review on the merits. The Fish and Wildlife Service's decision to switch to a prescriptive grazing regime was really anything but arbitrary and capricious as the district court held. A decision is only arbitrary under the APA if the association can show that the service, one, relied on factors that Congress did not intend for it to consider or that the service entirely failed to consider an important aspect of the problem. I think that's, I think that is the, as I understand it, the claim with respect to the numerical populations of grouse and antelope. As I understand the argument, it is how can we know that this area is being managed for a population not to exceed X if we don't know what the population is? And so the absence of an analysis of the numbers is deficient under 7509. I think that's the argument. But why aren't the numbers an essential ingredient of the analysis? Well, I have several responses. First, Executive Order 7509 does not require the Fish and Wildlife Service to specify any numbers below the 400,000 grouse and 1,500 antelope. But it requires that the substance of the decision made be different at populations below those maxima and above them. That is the, it seems to me that the maximum number is there for a reason. I don't know what the reason might be. But if you had twice that number, wouldn't you have to take that into account? Well, no, I disagree. I think, first of all, the 400,000 grouse and the 1,500 antelope are simply goals. But really, it's crazy. Well, that's not what the EO says. And it's not what we said in Schwenke either. All right. But I still disagree because grazing is third in line here. First priority is the grouse and antelope up to those numbers, those maximum numbers. Second in line is secondary wildlife species so as to maintain a balanced wildlife population. So until there is a balanced wildlife population in the Fish and Wildlife Service's decision, wildlife have priority on the range until that balanced wildlife population is achieved. That's correct as far as it goes, except that what you've said leaves out the possibility that there are excessive numbers of the two priority species. I mean, that could happen. But we don't know whether it's happened. Well, no, there is not a balanced wildlife population in this area. The wildlife habitat in this unit is so poor that few wildlife of any kind are regularly seen in this unit. So you're telling us that we're clearly under the cap for the grouse and the antelope. That's right. Is that in the record? Well, yes, in two places. First of all, Everett Russell at, I think, tab 10V or U, somewhere around there, states that there are such few wildlife in this area. But beyond that, the Fish and Wildlife Service does not set out to monitor populations of animals. It uses habitat as a proxy, much as the Forest Service does. And part of this habitat analysis is to assess whether or not there is 70% residual cover in the refuge. And the Forest Service's, I'm sorry, the Fish and Wildlife Service's monitoring shows that it has consistently failed to reach this 70% objective and has done so and has failed to do so for decades. And so until this refuge reaches 70% residual cover, we cannot say then that there is a balanced wildlife population. And again, there's numerous reports in the record that we cite in our brief that detail the condition of the range, the fact that it is falling far below the 70% residual cover measure. And there's also field reconnaissance in the record. This was not a decision – this was a decision that was made by professional managers and biologists that were familiar with this area. They went out onto this unit and specifically saw the poor condition of the range and attributed this to livestock grazing. And, you know, this is not also a decision where livestock grazing will never return to the area. They're going to wrest this area from livestock grazing until the health of the shrubs and forbs returns. And then they will use prescriptive grazing as a tool to manage the area. In the end, I don't think the plaintiffs have shown that the Fish and Wildlife Service's decision was arbitrary or capricious and the district court correctly deferred to the Fish and Wildlife Service's determination, and we would ask this court to uphold the judgment of the district court. Does it have any further questions? Counsel, in response, then, on the question as to whether you've done any population studies, your answer was tab 10. It looks like it would be at page 4 of that letter, which would be E-R-S-E-R. This is volume 2 of the excerpt of the record, page 505. That's a letter from Shoup to the Silver Dollar Grazing. Is that what you're referring to? No. Well, my answer was not that they had done population monitoring, but they had noted in the record that few wildlife are. Right. I think what I understood you to say was they have no intention of doing an actual population count. What they've been doing is using the cover as the 70 percent grass cover as a proxy for the habitat that's required in order to maintain adequate populations. That's right. And that they haven't achieved 70 percent grass cover. That's correct. They've consistently failed to reach that 70 percent cover requirement. Any further counsel? No. Thank you. Thank you. We will hear from Mr. Blomquist. You have some reserve time, a little reserve time. I have very little, Your Honor. In regards to the standing argument that this was a record review case, administrative record review case, to state that the plaintiffs need to come forward with detailed affidavits identifying the environmental injury ignores the fact that this is an administrative record case. The district court is supposed to rely upon the record, and certainly the plaintiffs can refer to their comments in the record on establishing the environmental injury or the environmental issue that they're concerned with. Counsel, what's your response to Mr. Raybender's claim that what the Forest Service was doing was measuring the cover and they had the 70 percent figure and they were using that as a proxy and the Forest Service found that they clearly had not, were not even close to the 70 percent cover required for the populations? Well, I think that may have been what they're doing, but that goes also to our claim on the violation of the Silver Dollar Habitat Management Plan because the Habitat Management Plan called for something different. It called for a monitoring of populations, which is on tab 10A at 9. It talked about a wildlife inventory plan, which involved surveys and those types of things, and importantly, on the habitat as a proxy approach, it also, the Habitat Management Plan had a monitoring plan for the vegetation, which we point out they never complied with. They never did the necessary monitoring that the Habitat Management Plan called for, and in fact, as we also point out at tab 10D, U.S. Fish and Wildlife's own biologists in reviewing the data and reviewing the monitoring recognized they had not done it sufficiently. They recognized that there was no objective basis to assess the allotment and the impacts of livestock grazing on wildlife or wildlife habitat. Your reading of the Silver Dollar, then HMP, at page 9 is that they were required to do an inventory on the four species listed there. Is that correct? Yes. And that they haven't done that inventory? The evaluation methodology was not complied with. Thank you, counsel. Your time has expired. Thank you. The case just argued will be submitted for decision, and the court will take a morning break. Ten minutes.
judges: O'scannlain, Graber, Bybee